CECIL A. DONALDSON AND LISELOTTE DONALDSON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4209–67.   Filed February 25, 1969.

Cecil A. Donaldson, pro se.
*Robert D. Hoffman,* for respondent.

FEATHERSTON, *Judge:* Respondent determined a deficiency in petitioners' joint Federal income tax for 1963 in the amount of $2,736.56. The only issue for decision is whether the compensation received by petitioner Cecil A. Donaldson during 1963 from the American Embassy Cooperative Commissary in Pakistan was paid by an agency of the United States, and hence was not excludable from petitioners' gross income under section 911(a).[1]

### FINDINGS OF FACT

Cecil A. Donaldson (hereinafter referred to as petitioner) and Liselotte Donaldson, husband and wife, are citizens of the United States who were residing in Pakistan during the taxable year 1963. They were legal residents of Huntsville, Ala., when their petition was filed. Petitioners filed a joint Federal income tax return for the taxable year 1963 with the director of international operations of the Internal Revenue Service at Washington, D.C.

Petitioner resided with his family in Karachi, Pakistan, from December 3, 1957, through December 22, 1963. He held a civil service position with the Department of Defense until July 1961, when he resigned and returned to the United States for a brief vacation trip.

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

The Government paid the transportation expenses for his trip to the United States. In August 1961 he returned to Pakistan to assume duties with the American Embassy Cooperative Commissary (sometimes referred to herein as the commissary) as assistant manager, under a 2-year contract subject to renewal by mutual agreement. The commissary paid petitioner's transportation expenses to Pakistan from the United States in August 1961, and from Pakistan to the United States on December 22, 1963, when his employment with the commissary terminated.

The Secretary of State has prescribed regulations governing the organization and management of "non-Government-operated commissary * * * facilities at posts abroad." The pertinent parts of these "Uniform State/AID/USIA Regulations," issued under section 921(b) of the Foreign Service Act of 1946 (22 U.S.C. sec. 1139(b) (1964)) are as follows:

514 DELEGATIONS OF AUTHORITY

514.1 Department of State. There is hereby delegated to the principal officer at each post or his designee the authority vested in the Secretary under section 912(b) [sic] of the Foreign Service Act of 1946, as amended, to be exercised within Departmental directives and the following guidelines:

a. All commissary and recreation facilities overseas shall be employee-association operated under general standards and criteria established by the Department * * *

b. The principal officer at each post, after appropriate consultation with heads of other agencies at the post, shall determine the need for and the economic feasibility of each type of service or facility existing or proposed.

c. Normally, funds for the establishment of commissary and recreation facilities are obtained from employees by means of returnable deposits. * * * When required, the Department will provide official funds to assist in the establishment of new commissary and recreation facilities.

d. The principal officer, or his designee, shall be responsible for monitoring the activities of commissary and recreation associations to assure that the operations of such activities are conducted in a prudent manner in accordance with the policies of the Department and regulations prescribed herein.

e. The Department will provide assistance in locating suitable management personnel or in assigning regular Foreign Service administrative personnel when the chief of mission so recommends and it is in the interest of the United States to do so. Assistance will also be provided by the Department in establishing military and civilian procurement channels, providing management counsel and in making periodic audits of the activities.

* * * * * * *

k. Whenever feasible, commissaries must be located on U.S. Government-held property. Physical structures on Government premises shall become the property of the Government at the expiration of the term specified in the permit or sooner in the event of liquidation of the association or discontinuance of its use for the purpose approved. * * *

* * * * * * *

m. Commissary, mess, and recreation facilities may be extended to employees and dependents of local or third-country nationality at the discretion of the

principal officer when in accordance with the prevailing laws and customs of the host country.

n. The existing assets of commissary and recreation associations are technically the property of current members. However, such assets have accrued largely through the efforts and contributions of former members and assistance from the United States Government. Therefore, in the liquidation or reorganization of any commissary, mess or recreation facilities, any surpluses, over and above deposits of the employees and any outstanding indebtedness, should be regarded as available for redistribution to facilities at other posts requiring financial assistance.

o. Employees of commissary, mess, or recreation facilities, while not Government employees, should be extended comparable benefits when possible. U.S. citizen employees are subject to preemployment suitability investigations. * * *

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

q. Charges will be at the same rates for all Government civilian and military personnel serviced by a commissary, mess, or recreation facility.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

515 GENERAL REQUIREMENTS

The United States Government assumes no liability for the obligations of commissary, mess, and recreation activities to third parties or local government. * * *

516 MINIMUM REQUIREMENTS.—Principal or administrative officers of the Department of State shall insure that, as a minimum requirement, the following control measures be adopted by employee associations:

a. The bonding of all personnel who are required to handle cash or readily converted assets in connection with their duty, or blanket bond coverage for all association employees.

b. Adequate insurance to protect the assets of the association from loss, such as public liability, fire, wind, water, and theft.

c. Provide officers and trustees of the association and the designee of the principal officer with a monthly statement of assets (balance sheet) and monthly statement of operations (profit-and-loss sheet).

One copy of the commissary balance sheet and one copy of the profit-and-loss statement are to be forwarded to the Department (OPR) by February 15, for the period July 1 to December 31, and by August 15, for the period January 1 to June 30.

d. An annual or more frequent audit, including a physical inventory of stock and equipment, by a firm of chartered, certified or otherwise qualified accountants, or by an audit committee of at least two disinterested U.S. Government employees, preferably with accounting experience.

The commissary operated under a constitution and bylaws which were governed by these regulations. The constitution and bylaws provide, in pertinent part:

## II  ELIGIBILITY FOR MEMBERSHIP

Any person whose legal residence is outside of Pakistan who is brought to Pakistan at the expense of the U.S. Government to work in Pakistan as an employee of the U.S. Government or under contract to the U.S. Government and who is entitled to duty free import privileges may become a member, and any family-head hired in Pakistan by the U.S. Government or placed under

contract in Pakistan to the U.S. Government who has duty free import privileges may become a member. His eligibility for membership ceases when he leaves Pakistan on Permanent change of station basis, or when his employment by or under contract to the U.S. Government is terminated.

### III  ADMISSION TO MEMBERSHIP

1. A person becomes a Commissary member * * * [On showing eligibility under II, above.]
2. He pays his Commissary membership dues * * *
3. He deposits with the Commissary an amount sufficient to cover his purchases and renews this deposit whenever purchases reduce the amount so that replenishment is necessary.

    *       *       *       *       *       *       *

### IV  GOVERNING BODY

The Governing Body shall consist of a Commissary Policy Committee and a Commissary Management Committee.

### V  COMMISSARY POLICY COMMITTEE

1. Policy decisions and any other necessary decisions in regard to the Commissary will be made by the Commissary Policy Committee.
2. Membership of the Commissary Policy Committee shall be as follows: The Ambassador, Chairman * * * [The heads of the various Government organizations with missions in Pakistan, and the project manager of a privately-owned American contractor.]
3. Membership of the Commissary Policy Committee may be changed as directed by the Ambassador.
4. The Commissary Policy Committee shall meet when necessary to transact business.

### VI  COMMISSARY MANAGEMENT COMMITTEE

1. The Commissary Management Committee shall be the active supervisory organization.
2. The Commissary Management Committee shall be made up of six members, one each from State, USIS. ICA, MAAG, TED, and OFW. * * * The member from State shall be Chairman of the Management Committee.[2]

    *       *       *       *       *       *       *

4. * * * The General Manager shall be a paid employee with salary rate established by the Management Committee based on his performance as well as on the salary scales prevailing for American Government employees in Karachi area. * * * He shall make all decisions necessary to operate the Commissary within the scope of the administrative rules and regulations promulgated by the Management Committee.
5. The Management Committee shall have the responsibility for promulgation of appropriate administration rules and regulations for the operation of the Commissary, subject to the guidance of the Policy Committee.

    *       *       *       *       *       *       *

---

[2] In actual practice, the representative of Oman-Farnsworth-Wright, an American contractor performing military construction for the Army Corps of Engineers, served as chairman.

## IX   AUDIT

The Management Committee is responsible for arranging for an annual audit of the Commissary books by competent auditors. * * *

## X   DISSOLUTION

The Commissary may be dissolved on order of the Ambassador. * * * With the approval of the Ambassador, disposition of residual assets will be made as decided by majority vote of the members.

At its expense, the commissary leased properties for four branch stores from Pakistani citizens. The commissary also financed the construction of its main building in Karachi during 1961 through a construction loan of $140,000 which it had negotiated with the American Express Co. However, the main building was located on property held by the United States Government—leased by the Agency for International Development (AID) from the Pakistani Government for a 10-year period. The main building, as well as the land, is to become the property of the Government of Pakistan upon expiration of the 10-year lease. AID had previously built several buildings on this tract; the American Embassy also constructed buildings, including a warehouse and a housing development, on an adjacent tract subject to the same lease. These tracts were on the outskirts of Karachi on reclaimed desert, and each building or complex of buildings was enclosed with a separate concrete wall.

In 1963 the commissary did not receive operating capital from the United States Government,[3] and the Government took no responsibility for the commissary's obligations to third parties or to the Pakistani Government. Operating capital was acquired from charges on members, consisting of an initial fee and periodic advance deposits against which purchases were made. The membership fees were returnable to the member when he left Pakistan. In a year prior to 1963, the commissary had borrowed $10,000 from Oman-Farnsworth-Wright (hereinafter OFW) to help finance needed expansion

Membership was available to all individuals who were entitled to import goods into Pakistan duty free—diplomatic personnel and employees of the U.S. Government or U. S. contractors, including third-party nationals working for the U.S. Army and OFW. Certain non-members, such as retired military personnel, were also permitted to shop at the commissary. Members of the commissary held no meetings.

The commissary provided its members with American-style food, household supplies, liquor, cigarettes, and other items which were in

---

[3] However, the record does not indicate whether the commissary paid rent to AID for the land upon which the commissary was located.

short supply in Pakistan. These items were purchased by the commissary both from the United States and foreign countries.

The operating profits of the commissary were used to make payments on existing loans from OFW and the American Express Co., to provide better quality food at the lowest possible cost—sometimes below cost—and to maintain such services as its own fire and security guards for its building and other assets. Fees for auditing the records of the commissary were also paid by commissary funds. The auditors, selected and paid by the Commissary Management Committee, were Government personnel who did the audit work while not on duty in their civil service positions.

Petitioner was paid $16,055.20 by the commissary for the taxable year 1963. Approximately $4,200 of this payment represented reimbursement to petitioner for transportation of himself, his family, and household goods from Pakistan to the United States, as provided in his contract with the commissary. In addition, petitioner received free living quarters furnished by the commissary.

While working for the commissary, petitioner was not covered by any of the Federal laws providing benefits for Government employees, such as the Civil Service Retirement Act. During the period petitioner was employed by the commissary he did not pay any Pakistani income taxes. At this time he had a regular passport, although prior to 1961, when he was employed in a civil service position, he held a special passport of the type issued to Government employees.

Petitioner reported the $16,055.20 received from the commissary in his 1963 return, but claimed an exclusion, for income earned abroad, in that amount. Respondent determined that the entire amount was includable in petitioner's taxable income for 1963.

## ULTIMATE FINDING OF FACT

The American Embassy Cooperative Commissary was an agency of the United States during 1963.

## OPINION

Section 911(a) [4] provides for the exclusion from the gross income of "a bona fide resident of a foreign country" of amounts received as earned income "from sources without the United States." Excepted

---

[4] SEC. 911. EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES.

(a) GENERAL RULE.—The following items shall not be included in gross income and shall be exempt from taxation under this subtitle:

(1) BONA FIDE RESIDENT OF FOREIGN COUNTRY.—In the case of an individual citizen of the United States who establishes to the satisfaction of the Secretary or his delegate that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, amounts received from sources without the United States (except amounts paid by the United States or any agency

are "amounts paid by the United States or any agency thereof." Respondent contends that the compensation received by petitioner during 1963 from the commissary is within this exception and thus not excludable from his gross income, conceding that petitioner otherwise qualifies for the exclusion. The question to be decided is whether the commissary was an agency of the United States within the meaning of section 911(a).

Section 911(a) was enacted for the purpose of promoting foreign trade, inducing Americans with technical expertise to accept employment overseas, and placing American businesses abroad on an equal footing with foreign competitors. See *Swenson* v. *Thomas*, 164 F. 2d 783 (C.A. 5, 1947); Comment, "Section 911(a)(2) Exemption Held Unavailable to Government Employees," 42 N.Y.U.L. Rev. 183 (1967). In furtherance of these purposes, and in an attempt to eliminate abuses of the use of the exclusion, the exception for "amounts paid by the United States or any agency thereof" was incorporated into the section. Although the legislative history of the exception refers specifically only to salaries of military personnel, ambassadors, and consular officials paid directly by the United States, the scope of the exception is broader; otherwise, the phrase "or any agency thereof" is surplusage. See *Kirchbaum* v. *United States*, 138 F. Supp. 515, 519–523 (E.D. Tenn. 1956), for an extensive review of the pertinent legislative history.

For guidance as to the breadth of the exception, respondent refers us to *Frank E. Raffensperger*, 33 T.C. 1097 (1960), where this Court held that salary payments made by the Union Club of Tokyo, an Army recreational facility, were amounts paid by an agency of the United States. Petitioner, on the other hand, cites *Brummit* v. *United States*, 329 F. 2d 966 (Ct. Cl. 1964), where on the particular facts the Court of Claims held that an officers' mess in Taipei was not an agency of the United States.

Our *Raffensperger* opinion relied heavily upon the Army regulations relating to nonappropriated-fund activities and upon *Standard Oil Co.* v. *Johnson*, 316 U.S. 481, 485 (1942), which held that Army post exchanges are immune from State tax because such organizations

thereof) which constitute earned income attributable to services performed during such uninterrupted period. The amount excluded under this paragraph for any taxable year shall be computed by applying the special rules contained in subsection (c).

(2) PRESENCE IN FOREIGN COUNTRY FOR 17 MONTHS.—In the case of an individual citizen of the United States who during any period of 18 consecutive months is present in a foreign country or countries during at least 510 full days in such period, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) which constitute earned income attributable to services performed during such 18-month period. The amount excluded under this paragraph for any taxable year shall be computed by applying the special rules contained in subsection (c).

are "arms of the Government deemed by it essential for the performance of governmental functions," "are integral parts of the War Department," and "share in fulfilling the duties entrusted to it." These decisions turned on all the facts concerning the relationship of the entity to the Government, including the statutory authority for the entity's organization, the regulations under which it was operated, the fiscal control to which it was subjected, and the character of its functions, whether governmental or commercial.[5]

In the light of these criteria, we have concluded that the commissary was an agency of the United States and that the amounts which it paid to petitioner as compensation were not excludable from his gross income for 1963.

The commissary was operated pursuant to section 921(b) of the Foreign Service Act of 1946[6] which provides that the Secretary of State may "authorize and assist in the establishment, maintenance, and operation, by officers and employees of the Service, of non-Government-operated" commissaries. The purpose of this legislation was to assist in alleviating adverse conditions abroad which might detract from the efficiency of the foreign service. Cf. *Frank E. Raffensperger*, *supra* at 1105 (discussing the purpose of post exchanges).

The legislative history of Foreign Service Act section 921 indicates that commissaries, mess services, and recreational facilities authorized by the section were intended to have a relationship to the United States similar to that enjoyed by corresponding facilities sponsored by the Armed Forces, described in *Standard Oil Co.* v. *Johnson, supra*, and in *Frank E. Raffensperger, supra*. Indeed, "to prevent any tendency toward a multiplication of facilities," the section provides that facilities organized under it shall, insofar as practicable, be made available to all Government personnel and their dependents stationed

---

[5] The Income Tax Regs. (sec. 1.911–1(a)(1)) state that to qualify for the sec. 911(a) exclusion a taxpayer must show, among other things, that he was "not paid by the United States or any agency or instrumentality thereof." This regulation equating "agency" with "instrumentality" is not particularly helpful, for the Commissioner has ruled that the American Red Cross—held to be an instrumentality of the Government for many purposes, see, e.g., *Gradall* v. *United States*, 329 F. 2d 960, 964 (Ct. Cl. 1963)—is not an agency of the United States within the meaning of sec. 911(a). Rev. Rul. 60–36, 1960–1 C.B. 279.

[6] 22 U.S.C. sec. 1139 (1964). Commissary and mess services and recreation facilities abroad; charges

(b) The Secretary, under such regulations as he may prescribe, may authorize and assist in the establishment, maintenance, and operation, by officers and employees of the Service, of non-Government-operated commissary and mess services and recreation facilities at posts abroad, including the furnishing of space, utilities, and properties owned or leased by the United States for use by its diplomatic and consular missions. The provisions of the Foreign Service Buildings Act, 1926, as amended, may be utilized by the Secretary in providing such assistance. Commissary or mess services and recreation facilities established pursuant to this subsection shall be made available, insofar as practicable, to officers and employees of other Government agencies and their dependents who are stationed abroad. Such services or facilities shall not be established in localities where another United States agency operates similar services or facilities unless the Secretary determines that such additional services or facilities are necessary.

abroad. Moreover, it "restricts the establishment of such facilities where another U.S. agency operates similar services. Thus, if the military operate a commissary available to foreign service personnel, the Secretary will not authorize the operation of a commissary by Foreign Service personnel unless he determines that it is necessary." H. Rept. No. 2696, 84th Cong., 2d Sess. (1956), U.S. Code Congressional and Administrative News, 84th Cong., 2d Sess., pp. 3615, 3625 (1956).[7]

Although section 921(b) of the Foreign Service Act describes the facilities established pursuant thereto as "non-Government-operated," in reality such facilities are operated pursuant to comprehensive regulations prescribed by the Secretary of State. These regulations, quoted in part in our findings, charge the "principal officer at each post" (in the case of Pakistan, the Ambassador), or his designee, with responsibility for monitoring the activities of commissary and recreation associations to assure that they are operated "in accordance with the policies of the Department." While the regulations give substantial latitude to individual posts in the organization, operation, and supervision of such activities, certain minimum requirements are prescribed—bonding of all personnel, maintaining adequate insurance, furnishing of monthly financial statements to the principal officer, and preparing annual audits. In addition, the regulations authorize the principal officer to determine the need for, and the economic feasibility of, each type of service existing or proposed; to assist "in locating suitable management personnel or in assigning regular Foreign Service administrative personnel when the chief of mission so recommends and it is in the interest of the United States to do so"; and to control the location of the commissaries (whenever feasible "on U.S. Government-held property"). Thus the regulations, in these and other respects, establish an intimate relationship between Foreign Service Act commissaries and the Department of State.

The Department of State, in this case, also exercised substantial direct control over the commissary's operations. Indeed, members of the commissary had no direct voice in its policies or management. These prerogatives rested in the Commissary Policy Committee and the Commissary Management Committee. The policy committee, which prescribed the major operational policies, was chaired by the Ambassador and consisted of the heads of the various Government organizations with missions in Pakistan, plus the project manager for OFW,

---

[7] Under sec. 921(a) of the Foreign Service Act, the Secretary, under such regulations as he may prescribe, is authorized to "establish and maintain emergency commissary or mess services in such places abroad where, in his judgment, such services are necessary temporarily to insure the effective and efficient performance of the duties and responsibilities of the Service." While it is clear that, in the years before the Court, the Commissary was operated under sec. 921(b) of that Act, the record does not show whether the commissary was originally established under sec. 921(a).

a privately owned contracting firm doing business in Pakistan. The composition of the policy committee was determined by the Ambassador and was subject to change by him at any time. The management committee, composed of representatives of the same organizations, had responsibility for providing supervision of the commissary's activities, including the promulgation of administrative rules and regulations, subject to the guidance of the policy committee.

Further manifestations of the State Department's control were (1) the express requirement in section 921(b) of the Foreign Service Act that all prices charged by an activity such as the commissary be at a uniform rate for all Government personnel; (2) the subjection of all employees of the commissary to preemployment suitability investigation and security clearance by the Department; and (3) the provision in the commissary's constitution and bylaws that the commissary "may be dissolved on order of the Ambassador." Thus, not only the policies and management of the commissary, but its very existence, were subject to Government control and direction. In resolving the issue before us, it is significant that many of these controls are strikingly similar to those exercised by military and civilian personnel over the affairs of post exchanges and recreational facilities established by the Armed Forces. *Standard Oil Co.* v. *Johnson, supra* at 484; *Frank E. Raffensperger, supra* at 1105.

Petitioner points to several factors he considers to be indicia of the commissary's fiscal independence. The members of the commissary provided the funds necessary for its operation, and the Government took no responsibility for the commissary's obligations to third parties or to the local government. The commissary's bylaws did not limit membership solely to Government employees, but made it available to all persons who had duty free import privileges. Each member was required to make a cash deposit, returnable upon his leaving Pakistan, and to make periodic advance deposits against which purchases were made. These were the sources of the commissary's operating capital. Finally, in addition to borrowing the $140,000 from the American Express Co. for the construction of its building, the commissary borrowed $10,000 from OFW to cover certain expansion costs.

However, these factors on which petitioner relies are not decisive. The operating funds of military post exchanges and recreational facilities are also obtained from their members, and the Government likewise assumes none of the financial obligations of such activities. *Standard Oil Co.* v. *Johnson, supra* at 485. And, as a practical matter, only U.S. Government employees and employees of U.S. contractors were admitted to membership of the commissary.

Indeed, in other respects the Government maintained substantial control over the finances of the commissary. The management com-

mittee selected the general manager and directed his handling of the commissary's financial affairs. The commissary accumulated no profits; rather, all profits either were used to repay the construction and expansion loans or were counterbalanced by reduced prices. The management committee was responsible for providing an annual audit of the commissary's books. Although private accountants prepared the audits and took the physical inventories, monthly financial statements were required to be furnished to the Ambassador, and copies of a semiannual balance sheet and profit and loss statement were required to be sent to the Department of State.

Furthermore, while the commissary's constitution and bylaws contemplated that the residual assets on dissolution would be disposed of in accordance with a majority vote of the members, their decision was subject to "the approval of the Ambassador." In this connection we note that the regulations provided that "in the liquidation or reorganization of any commissary, * * * any surpluses * * * should be regarded as available for redistribution to facilities at other posts requiring financial assistance." Cf. *Frank E. Raffensperger, supra* at 1105.

Petitioner has urged that the holding in *Brummit* v. *United States, supra,* is controlling. While there is some similarity here to *Brummit* with respect to the secondary facts upon which that decision relied— the club there was constructed on land independently owned; it negotiated its own construction loan; and it received no funds from the military command, 329 F. 2d at 969—there are distinguishing factors which render that decision inapposite. The court's conclusion that no fiscal control was exercised by the military command over the club was based mainly on the fact that no official Government audit, as required by the military regulations, was ever performed. We have pointed out that the State Department maintained substantial fiscal control over the commissary; and submission of copies of audits to the Ambassador and the Department of State served the same purpose as official audits performed by the Government.

Petitioner also emphasizes that he was not a Government employee; that he was issued a regular, rather than a special, passport; and that the commissary, not the Government, paid the cost of his transportation to and from Pakistan immediately before and after his term of employment as assistant manager of the commissary. But this Court has pointed out that "the statute does not require an employer-employee relationship. * * * All that is required is that petitioner be *paid by* the United States or an agency thereof." *Laurence P. Dowd,* 37 T.C. 399, 408–409 (1961) ; accord, *Robert W. Teskey,* 30 T.C. 456, 461–462 (1958).

In summary, on consideration of all the facts, we hold that the commissary was an agency of the United States. It was engaged in

governmental rather than commercial functions, since its sole purpose was to contribute to the efficiency and convenience of the personnel of Government organizations with missions in Pakistan. It had no commercial objective, in that profits derived from its operations were used to reduce the sales price of items handled by the commissary. The Ambassador could order its dissolution at any time and, upon dissolution, its assets could be distributed only with the approval of the Ambassador. Policy, as well as management direction, was vested in the Ambassador, his staff, and the staffs of the various missions in Pakistan. We conclude, therefore, that petitioner is not entitled to exclude the compensation he received from the commissary from his gross income for 1963.

*Decision will be entered for the respondent.*