Donald R. Dykes and Essie J. Dykes v. Commissioner.
Dykes v. Commissioner
Docket No. 2562-70.
United States Tax Court
T.C. Memo 1971-266; 1971 Tax Ct. Memo LEXIS 65; 30 T.C.M. (CCH) 1141; T.C.M. (RIA) 71266; October 18, 1971, Filed. James D. Webb III, 920 Hartford Bldg., Dallas, Tex., for the petitioners. W. John Howard, Jr., for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for the years 1966 and 1967 in the respective amounts of $777.84 and $468.68. The only issue for decision is whether *66 the compensation received by petitioner Essie J. Dykes during 1966 and 1967 from the United States Employees' Association of Tehran, Iran, constituted payments by an agency of the United States and was thus not excludable from petitioners' gross income under section 911(a). [1]
Findings of Fact Some of the facts have been stipulated and are so found. Donald R. Dykes and Essie J. Dykes (herein called petitioners) are husband and wife and citizens of the United States who were residing in Iran during 1966 and 1967. They were legal residents of Greenville, Texas, on the date the petition in this case was filed. Petitioners filed their joint Federal income tax returns for the years 1966 and 1967 with the district director of internal revenue, Austin, Texas, and the director of international operations, Washington, D.C., respectively. Donald R. Dykes was on active duty with the United States Air Force prior to and during the years here involved. When he was assigned to his post in Iran, Essie J. Dykes (herein called petitioner) and their two children accompanied him *67 as his dependents. From March 1965 to June 1967, petitioners and their children resided in Tehran in a private home rented from an Iranian national. Before they departed for Iran petitioners received information about the United States Employees' Association and its main function of providing members with grocery and drug items from the United States at prices lower than those in effect elsewhere in Tehran. Petitioners joined the Association by paying membership fees of $150. A portion of this sum was refunded to petitioners when the Association became able to reduce its fees due to an increased membership. The balance of the fee paid was refunded when petitioners left Iran in 1967. When petitioner Essie J. Dykes arrived in Tehran she was not employed. In August 1965, she applied for employment with the United States Employees' Association. Petitioner was interviewed by Mr. Sells, the general manager of the Association. In October 1965, she was employed as a cashier 1142 and checker in the Association's commissary or grocery store. After three months petitioner was made a clerk in the Association's shipping department, which distributed merchandise to members outside of Tehran *68 who could not shop in person at the Association store. Petitioner was paid by check on the first and fifteenth of each month. The check was drawn on the Association's United States checking account in United States dollars. The Association had its own compound surrounded by a fence and high walls, with a parking area for customers at the front and a loading dock at the rear. This was not part of the United States Embassy compound. Located within the compound were two buildings. A restaurant and bar were in one building while the other contained the grocery store where food, drugs and other household items were sold, a rental agency where various items were available for rental by members, a book store and warehouse. Two Iranian guards were employed by the Association at the compound. One directed traffic while the other acted as a security officer. The Association obtained its merchandise from individuals or corporations normally engaged in supplying products at wholesale in foreign commerce. Produce and perishables were obtained on the local Iranian market. No goods were purchased from the United States Government or Armed Services and no products that were United States Government *69 issue, normally available in commissaries operated by the Air Force, were sold at the Association store. In pricing its merchandise, the Association attempted to restrict its profit margins as much as possible and prices were based on original cost, losses incurred through spoilage or damage and insurance costs. The Association maintained no place of business within the United States and, with the exception of a bank account maintained there, conducted no other activities there. Its address is "American Embassy, Tehran, Iran, APO New York 09205." The Association is not a commissary operated by the Armed Forces of the United States. An open membership meeting was held by the Association at least once each year at which time the financial reports were discussed and any required changes in operation were considered. The financial statements, which were distributed to the membership annually, were audited by a firm of English public accountants retained by the Association. The Association had some members who were not United States citizens. It also had employees who were not United States citizens. In addition, there were persons who were neither members of the Association nor United *70 States citizens who on occasion made use of its shopping facilities. The Association is operated under a Constitution and By-laws. It was organized to offer recreational activities for its members and their dependents as well as food and other items at minimum prices which are consistent with good service and efficient management. All monies, including membership fees, deposits and operating revenue derived by the Association were to be used for this purpose. The constitution was adopted upon the approval of the Ambassador on November 3, 1964, and provides in pertinent part: ARTICLE II. Membership 1. Membership in the Association is limited to United States citizens who are not permanent residents of Iran and who by the nature of their duty assignments in Iran are permitted under agreement with the Government of Iran to import goods duty-free for themselves and their dependents, except that such membership will not be open to dependents of individuals who do not enjoy duty-free entry privileges. 2. Application for membership not covered in the first paragraph of this Article will be acted upon by the Board of Directors. 3. The above qualifications for membership will not *71 be retroactive. 4. Membership in the Association shall be granted upon fulfillment of the conditions mentioned below as specified for the class of membership together with supplementary conditions stated in the By-Laws of the Association. There shall be two classes of membership: (a) Full members of the Association shall be United States personnel assigned to duty in Iran for a period longer than 90 days who meet the membership requirements of paragraphs 1 or 2 of this Article. (b) Temporary members shall be citizens of the United States who meet conditions of paragraphs 1 or 2 of this Article and who are assigned to temporary duty in Iran of less than 90 days. Official U.S. Government visitors may 1143 be granted the courtesy of temporary memberships. All temporary members will be limited in their purchases of rationed or scarce commissary items. (c) Admission to all classes of membership shall require a written application. It must be accompanied by the prescribed deposit as stipulated in the By-Laws of the Association. Full members only shall have voting rights at annual and special meetings of the Association. ARTICLE III. Government of the Association 1. The *72 business of the Association will be conducted by: (a) Membership meetings. (b) The Board of Directors. (c) Special Committees. (d) The General Manager of the Association and other employees. 2. The Board of Directors will carry on all of the Association's business; however, its action will be subject to the review of the Ambassador. 3. The Board of Directors is empowered to write the By-Laws and revise them as necessary to administer and regulate the activities and functions of the Association. * * * ARTICLE VI. Rules of Meetings 1. A quorum for any membership meeting is 10 per cent of the members, or 50 members, whichever is less. 2. In the absence of a member, his spouse or dependent over 18 years old is entitled to his one vote. Any one of these persons may be counted toward a quorum. 3. Any question about a person's right to vote or to be counted for a quorum will be settled by the register kept by the Secretary of the Board. The Secretary will have this register at every membership meeting and let any member inspect it. 4. There will be no voting by proxy except by members who are stationed outside Tehran and its vicinity. 5. Robert's Rules of Order will *73 be the last word in disputes over meeting procedures. ARTICLE VII. Board of Directors 1. The Board of Directors will be composed of full members of the Association. (a) The Chairman of the Board will be appointed by the Ambassador. One member will be designated for each of the following agencies: US AID, Gulf District, USIS, Embassy, GENMISH, and the Bureau of Public Roads, and two from ARMISH/MAAG. (b) The Chairman of the Women's Advisory Committee shall attend all meetings of the Board, but may not vote on matters decided by the Board. 2. Each Board member will be appointed by the head of the agency represented and will serve at the pleasure of the agency. At the time of appointment of the Board member, the agency head will also appoint an alternate to serve in case of the member's absence. 3. At the first meeting of a new Board of Directors appointed under this Constitution, the Board will elect, from their membership, by majority vote, a Vice Chairman of the Board, a Secretary, and a Treasurer. 4. In case there is a vacancy on the Board, through permanent transfer or some other cause, it will be filled from among the Association members of the departing Director's *74 agency. The new Director will serve for the remainder of the term. 5. The duties and responsibilities of the Board of Directors will be specified in the By-Laws. * * * ARTICLE IX. Finances 1. The fiscal year for the Association shall be from July 1 to June 30. 2. Profits of the Association will be kept at a minimum, consistent with efficient operation and sound financial management. 3. Accounts of the Association shall be kept in accordance with standard accounting practices employed by U.S. business firms. ARTICLE X. Dissolution 1. The Association may be dissolved upon the order of the Ambassador or upon approval of two-thirds of the members. 2. On dissolution of the Association: (a) Membership contributions will be returned to the members after individual deductions of any debts to the Association. (b) A decision as to the distribution of any remaining funds will be made by the Ambassador upon the recommendation of the Board of Directors. ARTICLE XI. Amendments 1. This Constitution may be amended by passage of the proposed amendment at either a regular or special membership meeting plus the approval of the Ambassador, provided that a copy of the proposed amendment *75 shall be furnished 1144 each member at least five days before the date of the meeting, and provided further that, if deemed appropriate by the Board of Directors, the proposed amendment may be voted upon by means of ballots distributed to the members in lieu of a membership meeting. Upon approval by the Ambassador, the amendment shall be immediately effective. ARTICLE XII. Adoption of Constitution 1. This Constitution will become effective upon its approval by two-thirds of the membership voting and the Ambassador. The board of directors pursuant to Article III of the Constitution of the Association adopted bylaws. The bylaws provide for payment of membership dues, issuance of Association cards and that a member may inspect the Association's books of account, inventory and other affairs and inspect the minutes of the board of directors meetings. The other bylaw provisions cover purchases in the Association's facilities and cashing personal checks. Section 2 of the bylaws provides for monthly meetings of the board and the general operations of the Association. Section 3 of the bylaws provides for the hiring of a general manager of the Association. The general manager hired *76 by the board is to supervise the day to day activities of the Association, purchase all food and other merchandise, and keep all the records, and he is given authority to hire and fire a staff to assist him in the running of the Association. From October 1965 to June 1967, petitioner was employed as a clerk and warehouse manager by the Association. She was not bonded by the Association. Her wages for 1966 were $4,294.54 and $2,814.19 for 1967. As an employee of the Association petitioner was not covered under either the Civil Service Retirement Act or the Foreign Service Retirement Act. Ultimate Finding of Fact The United States Employees' Association of Tehran, Iran, was an agency of the United States during 1966 and 1967. Opinion This case is identical to the case of Arnold A. Morse, Sr., - F. 2d - (Ct.cl., June 11, 1971), 71-1 USTC 9482, 27 A.F.T.R. 2d 71-1515, where another employee of the United States Employees' Association of Tehran, Iran, sought to exclude from his gross income for the year 1966 his salary from the Association under the provisions of section 911(a). Petitioners urge, as did Mr. Morse before the Court of Claims, that this Association *77 is not an "agency" of the United States within the meaning of section 911(a)(2). [2]
Summarizing petitioners' contentions, they argue that petitioner Essie J. Dykes (1) was not directly or indirectly employed or salaried by the United States; (2) was employed by a foreign association and competed with Iranian nationals for identical wages; (3) had no employee benefits, retirement *78 plan, group life insurance benefits or career tenure program which was directly or indirectly provided by the United States; and (4) was compensated solely by a foreign association wholly unrelated to the United States Government. Petitioners also contend that the term "agency," as used in section 911(a)(2), is undefined in the statute, the applicable regulations or the legislative history of that section and is therefore unclear and vague. They suggest that for an "agency" of the United States to exist either its funding or some other fixed obligation toward the support of the "agency" or its employees should come from the United States. In Morse, supra, the Court of Claims adopted a broader position with which we agree: It is clear that plaintiff was in no sense a Government employee. However, the exception in § 911(a)(2) does not require that there by any employment relationship with the Government, nor is there a requirement that amounts so paij must be out of Treasury funds. It may be paid by an "agency." While this term, so familiar to Washingtonians, may have varied meanings according to context, Webster's Unabridged Dictionary (3d Ed. 1145 1968), assigns as one meaning: *79 "a person or thing through which power is exerted or an end is achieved: Instrumentality." We think that is the meaning Congress intended here. Moreover, as we pointed out in the case of Cecil A. Donaldson, 51 T.C. 830, 836 (1969): Although the legislative history of the exception refers specifically only to salaries of military personnel, ambassadors, and consular officials paid directly by the United States, the scope of the exception is broader; otherwise, the phrase "or any agency thereof" is surplusage. See Kirchbaum v. United States, 138 F. Supp. 515, 519-523 (E.D. Tenn. 1956), for an extensive review of the pertinent legislative history. In the instant case the Association's principal purpose was to contribute to the efficiency and convenience of the personnel of Government organizations with missions in Iran. It was the testimony of petitioner, Donald R. Dykes, that since no military commissary was authorized in Iran, the Association was originally set up to make available a commissary for Americans and their dependents stationed in Iran. As in Donaldson, the Association was not designed to accumulate profits. Rather, profits of the Association *80 were to be kept at a minimum, consistent with efficient operation and sound financial management. As in Donaldson, the Ambassador could order its dissolution at any time and, upon dissolution, its assets could be distributed only with the approval of the Ambassador. Management vested in a board of directors composed of representatives appointed by the heads of other American agencies in Iran and was subject to the review of the Ambassador. The chairman of the board was appointed by the Ambassador. Petitioners emphasize that Essie J. Dykes was not a Government employee and that she traveled to and resided in Iran as the dependent of her Air Force husband. A similar contention was made in Donaldson, supra, and we pointed out that an employer-employee relationship is not required by the statute; "All that is required is that petitioner be paid by the United States or an agency thereof." Laurence P. Dowd, 37 T.C. 399, 408-409 (1961); accord Robert W. Teskey, 30 T.C. 456, 461-462 (1958). Although some doubt existed regarding the applicability of the Foreign Service Act to this Association at the trial of this case, it is clear from the Morse case *81 that the Association was established under the authority of State Department Regulations published in section 500, Volume 6, Foreign Affairs Manual, and issued pursuant to section 921(b) of the Foreign Service Act of 1946, as amended, 22 U.S.C. § 1139(b) (1964). Section 921(b) authorizes the Secretary of State to prescribe regulations for the "establishment, maintenance, and operation by officers and employees of the Service, of non-Government operated commissary and mess services and recreation facilities at posts abroad." In Arnold A. Morse, Sr., supra, the Court of Claims said: These Regulations provide extensive general standards for the operation of of "non-Government operated commissary mess services and recreational facilities abroad." They provide initially that "all" such facilities "shall" be operated under these general standards and criteria. The principal officer at each post, here the Ambassador, is given the responsibility for making the initial determination of the need for and feasibility of establishing a facility. The Regulations specifically prohibit the establishment of any in localities where another United States agency operates similar *82 facilities. Whenever feasible, they must be located on United States Government-held property; if that is not possible "an inconspicuous place should be selected." The principal officer is given authority to provide "necessary supplies, equipment, utilities and space in properties owned or leased by the United States Government." The Association here occupied rent-free quarters on the embassy compound. Appropriated funds "will" be made available "when required" to help establish new facilities. In the instant case, membership subscription fees furnished the initial working capital. The principal officer has the responsibility for "monitoring the activities of commissary and recreation assocations to assure that the operations of such activities are conducted in a prudent manner in accordance with the policies of the Department and regulations prescribed herein." It is clearly pointed out that the Government will not be responsible for any obligations of employee associations but at the same time, certain minimum fiscal control measures are set forth. These are requirements for employee bonding, adequate insurance, independent audit and inventory, and the requirement that the principal *83 officer be furnished a monthly statement of operations and balance sheet. All profits "will be used for welfare and recreational activities." The constitution of the Tehran Association provides that profits will be "kept at a minimum 1146 consistent with efficient operation and sound financial management." Upon liquidation, any surplus "should be regarded as available for redistribution to facilities at other posts requiring financial assistance. The Association also operates under a constitution and bylaws. The adoption of that constitution and the adoption of any amendments that might be proposed expressly required the approval of the United States Ambassador. The board of directors carried on all of the Association's business, but its action was subject to the review of the Ambassador. The Ambassador appointed the chairman of the board of directors which was composed of representatives designated from each of the specified United States agencies in Iran. Each board member was to be appointed by the head of the agency so represented and to serve at the pleasure of that agency. Any vacancy on the board was to be filled by another representative from the departing director's *84 agency. The Association could be dissolved upon the order of the Ambassador or upon approval of two-thirds of its members. In the event of a dissolution, the distribution of funds remaining after debts and returned membership deposits would be made by the Ambassador upon the recommendation of the board of directors. Thus, not only the policies and management of the Association, but its very existence, was subject to Government control and direction by the Ambassador and the board of directors composed of representatives appointed by the heads of other Government agencies. Accordingly, we conclude that the United States Employees' Association of Tehran is an "agency" of the United States Government within the meaning of section 911 (a)(2), Arnold A. Morse, Sr., supra. [3]
*85 Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. SEC. 911. EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES. (a) General Rule. - The following items shall not be included in gross income and shall be exempt from taxation under this subtitle: * * * (2) Presence in Foreign Country for 17 Months. - In the case of an individual citizen of the United States who during any period of 18 consecutive months is present in a foreign country or countries during at least 510 full days in such period, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) which constitute earned income attributable to services performed during such 18-month period. The amount excluded under this paragraph for any taxable year shall be computed by applying the special rules contained in subsection (c).↩
3. See also Frank E. Raffensperger, 33 T.C. 1097 (1960), holding a civilian personnel social club known as the Union Club of Tokyo, operated under U.S. Army regulations, to be an "agency" of the United States; Standard Oil Company of California v. Johnson, 316 U.S. 481 (1942), holding that a post exchange facility regulated by the Army was an arm of the Government; United States v. Forfari, 268 F. 2d 29 (C.A. 9, 1959), holding that a cafeteria system operating a commissioned officers' mess as a non-profit corporation, managed by a civilian, but under the control of the Navy, is a non-appropriated fund instrumentality of the United States; Air Force Central Welfare Fund v. Henderson, 483 P. 2d 1154 (S. Ct. Oklahoma 1971), similarly holding a cafeteria on a U.S. air base to be a non-appropriated fund instrumentality of the United States; and Chester D. Taylor, Jr., T.C. Memo. 1971-53↩, holding a non-profit kindergarten school located on a U.S. air base in the Philippines to be a non-appropriated fund instrumentality of the United States.